**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

ANASTASIA GRADY, et al.,

                Plaintiffs,

v.                                 CIVIL ACTION NO.   2:24-cv-00214

WOOD COUNTY, WEST VIRGINIA,

                Defendant.

**MEMORANDUM OPINION & ORDER**

Before the Court are the parties' motions for summary judgment.   For the reasons set forth below, Plaintiffs' Motion for Summary Judgment, (ECF No. 28), is **GRANTED** and Defendant's Motion for Summary Judgment, (ECF No. 30), is **DENIED**.

## *I.     BACKGROUND*

On April 25, 2024, Plaintiffs Anatasia Reutelshofer (formerly Grady) and Kenneth S. Grady ("Plaintiffs") brought this action against the Wood County Commission ("Defendant") alleging four violations of the United States Constitution through 42 U.S.C. § 1983.   (ECF No. 1.)   This matter arises from the placement of a tax lien on Plaintiffs' property and the subsequent transfer of the property's tax deed due to Plaintiffs' non-payment of their property taxes.   (*Id.*)   Plaintiffs are siblings and received joint title to the 1300 West Virginia Avenue, Parkersburg, West Virginia property from their mother, Dawna Grady, in 2019.   (*Id.* at 2.)   Plaintiffs agreed that Reutelshofer would reside there and pay the taxes on the property.   (*Id.* at 3.)

1

Reutelshofer and her husband later suffered financial hardships and became delinquent on the property taxes. (*See* ECF No. 30-2.) Under West Virginia law, the delinquency resulted in a lien being placed on the property. W. Va. Code § 11A–1–2 (1961) ("[t]here shall be a lien on all real property for the taxes assessed thereon"). West Virginia law also mandated the publication and posting of delinquent property tax lists on two separate occasions. W. Va. Code §§ 11A–2–13 (2006) and 11A–3–2 (2007.) This included, at least 30 days before the sale of a tax lien, "a notice of the delinquency and the date of sale by certified mail [t]o the last known address of each person listed in the books whose taxes are delinquent[.]" W. Va. Code § 11A–3–2(b).

On November 10, 2020, after the initial notification process and redemption period passed, the Wood County Sheriff auctioned the tax lien to third-party bidder TASHPA, LLC ("TASHPA") for $4,750.00. (ECF Nos. 31 at 2-3; 30-1; 30-3.) At the time of the auction, the amount owed to Defendant for all unpaid taxes, interest, and costs of collection was $701.28. (*See* ECF No. 30-1.) The tax lien sale occurred pursuant to West Virginia Code §§ 11A–3–5(a) (2000) and 11A–3–14(a) (1998).[1] Due to a mistake by Plaintiff Reutelshofer in directing her payment to the wrong account, the tax lien on the property was not redeemed by the March 31, 2022, deadline. (ECF No. 31 at 3-4.) At this time, the total amount owed to Defendant was $2,238.18. (ECF No. 28-5.) For 2022, the Wood County Assessor evaluated the fair market value of the property at $105,400.00. (ECF No. 28-1.)

Following a failure to redeem, Defendant had the authority pursuant to West Virginia Code § 11A-3-27[2] to issue tax deeds transferring ownership of tax delinquent properties to the holder of the tax lien previously auctioned by the Sheriff. Accordingly, on April 29, 2022, the Clerk of

---

[1] These statutes were *repealed by* Acts 2022, C. 271, eff. June 10, 2022.
[2] West Virginia Code § 11A-3-27 was also *repealed by* Acts 2022, C. 271, eff. June 10, 2022.

the Wood County Commission officially exercised the County's authority and signed the tax deed transferring legal ownership of the property from Plaintiffs to TASHPA.   (ECF No. 30-4.)   Under the law then in effect, issuance of the tax deed terminated Plaintiffs' right of redemption and all their legal rights, title, equity, and interest in that home, assigning all those rights, value, and legal title to TASHPA.   (*See id.*)

Currently pending before the Court are two causes of action.   In Count I, Plaintiffs allege that Defendant's act of issuing the tax deed to TASHPA on April 29, 2022, was an uncompensated taking in violation of the Fifth Amendment that deprived Plaintiffs of the equity in their property in excess of the taxes owed.   (ECF No. 1 at 9.)   In Count II, Plaintiffs allege that the same conduct constituted an excessive fine in violation of the Eighth Amendment.   (*Id.* at 9-10.)

The parties filed cross-motions for summary judgment. (ECF Nos. 28, 30). The parties filed respective responses, (ECF Nos. 32, 33), and replies, (ECF Nos. 34, 35). As such, these motions are fully briefed and ripe for adjudication.

## II.     *LEGAL STANDARD*

A grant of summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  For the nonmovant to survive a summary judgment motion, they must counter with a "show[ing] that there is a genuine dispute of material fact." *Simmons v. Whitaker*, 106 F.4th 379, 384–85 (4th Cir. 2024).   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News and Observer Publ. Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   Either party may prove or disprove a

genuine dispute of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In determining the existence of a genuine dispute of material fact, the Court must "view all facts, and reasonable inferences taken therefrom, in the light most favorable to the nonmoving party." *Bhattacharya v. Murray*, 93 F.4th 675, 686 (4th Cir. 2024).

### III.    DISCUSSION

The parties' cross-motions for summary judgment present near identical arguments. The parties dispute whether an uncompensated taking and excessive fine occurred. Each issue is addressed in turn below.

#### A. Count I

In Count I, Plaintiffs allege that Defendant's issuance of a tax deed to TASHPA on April 29, 2022, was an uncompensated taking in violation of the Fifth Amendment that deprived Plaintiffs of the equity of their property in excess of the taxes owed. (ECF No. 1 at ¶¶ 34-36, 50-53.) In this context, determining whether a Takings Clause violation occurred requires two steps. *See Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631 (2023) First, the court must determine whether a protected property interest exists in the excess equity of a home following a tax lien sale. Second, the court must determine whether, by transferring the tax deed to TASHPA, Defendant engaged in an uncompensated taking in violation of the Fifth Amendment. As discussed below, the Court answers these questions in the affirmative.

1.  *Plaintiffs' Property Interest*

The Fifth Amendment's Takings Clause, applicable to the states through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." *Philips v. Washington Legal Found.*, 524 U.S. 156, 164 (1998) (internal quotations omitted). "State law is one important source. But state law cannot be the only source. Otherwise, a State could sidestep the Takings Clause by disavowing traditional property interests in assets it wishes to appropriate." *Tyler* 598 U.S. at 638 (internal quotations omitted).

Thus, to determine whether a property interest exists in the excess equity of a home following a tax deed transfer, the Court must examine controlling precedent, traditional property principles and historic practices, and state law. *See id*. All three are discussed in turn below.

i.  <u>Supreme Court Precedent and Traditional Property Principles</u>

Property taxes "are not themselves a taking, but are a mandated contribution from individuals . . . for support of the government . . . for which they receive compensation in the protection which government affords." *Id.* at 637. "In collecting these taxes, the State may impose interest and late fees. It may also seize and sell property, including land, to *recover the amount owed*." *Id.* at 637-38 (emphasis added). However, "a taxpayer is entitled to the surplus in excess of the debt owed" because the government cannot "use the toehold of the tax debt to confiscate more property than was due." *Id.* at 639, 642.

In *Tyler*, a woman alleged that a Minnesota county violated the Takings Clause when the county seized her condo to satisfy a $15,000 tax debt, sold the property for $40,000, and kept the excess proceeds.   598 U.S. at 635.   In considering whether the excess value from the tax sale was protected property under the Takings Clause, the Supreme Court of the United States looked at state law, traditional property law principles and historical practice, and the Court's precedents. *Id.* at 638.   As it related to traditional property law principles and history, the Court stated that "[t]he principle that a government may not take more from a taxpayer than she owes can trace its origins at least as far back as . . . 1215."  *Id.* at 639.   "This principle made its way across the Atlantic.   In collecting taxes, the new Government of the United States could seize and sell only so much of [a] tract of land . . . as may be necessary to satisfy the taxes due thereon."   *Id.* at 640 (internal quotations omitted).   "The consensus that a government could not take more property than it was owed held true through the passage of the Fourteenth Amendment."   *Id.* at 641.   Upon examining the aforementioned sources of law, the Court determined that the plaintiff had a property interest protected by the Takings Clause and had plausibly alleged a claim for a taking without just compensation.   *Id.* 647.

Although *Tyler* did not address whether a protected property interest existed in the equity of a home following a tax deed transfer, subsequent orders from the Supreme Court indicate that *Tyler* is applicable to the present case.   *See Continental Resources v. Fair,* 311 Neb. 184 (2022) ("*Fair I*"), *vacated* 143 S. Ct. 2580; *Nieveen v. TAX 106*, 311 Neb. 574, (2022), *vacated* 143 S. Ct. 2580.   In *Fair I*, the Fairs failed to pay the property taxes they owed on property in Scotts Bluff County, Nebraska.   *Fair I*, 311 Neb. at 187.   In compliance with state law, the county published a list of tax-delinquent properties in an area newspaper, including the Fairs' property.

6

*Id.* The county treasurer eventually sold a tax certificate for the property's unpaid taxes to Continental Resources ("Continental") for $588.21. *Id.* Continental then paid the subsequent property taxes as if it were the owner, and the Fairs did not attempt to make any payment for the delinquent property taxes. *Id.* Three years later, Continental served the Fairs with a "Notice of Expiration of Right of Redemption" notifying the Fairs that they had three months to pay the $5,268 redemption cost. *Id.* The Fairs did not make payment, and Continental applied for a tax deed. *Id.* The county treasurer issued a tax deed to Continental for the property, which the county assessed to be worth $59,759 at the time. *Id.* at 188.

Continental thereafter filed a quiet title action against the Fairs. *Id.* The district court granted summary judgment against the Fairs and quieted title to the property in Continental's favor. *Id.* The district court found that the tax certificate sale statutes were not unconstitutional in the manner alleged. *Id.* The Fairs alleged that the district court erred because the tax sale process violated the Takings Clause of the Fifth Amendment. *Id.* On appeal, the Nebraska Supreme Court rejected the Fairs' argument, holding that because Nebraska law did not recognize that a former owner had a property right to equity in the property in excess of the tax debt, Fair could not establish a taking without just compensation. *Id.* at 201.

Following that decision, the Fairs filed a petition for certiorari in the U.S. Supreme Court. 143 S. Ct. 2580. While the petition was pending, the Supreme Court rendered its decision in *Tyler*. *Id.* Following *Tyler*, the Supreme Court granted the Fairs' petition for writ of certiorari, vacated the Nebraska Supreme Court's judgment in *Fair I*, and remanded the case for further consideration in light of *Tyler*. *Id.* In vacating the judgment and remanding the case, an implication exists as to how the Supreme Court may view property interests following tax lien

sales.   On remand, the Nebraska Supreme Court applied the property interest analysis in *Tyler*.

*Continental Resources v. Fair*, 317 Neb. 391, 401-05 (2024) ("*Fair II*").   In doing so, the court

determined that "Fair had a protected property interest to the extent the value of the property

exceeded his tax debt" because traditional property principles and Nebraska law[3] "generally

recognize a property right."   *Id.* at 405.

The U.S. Supreme Court's declination to review a holding that an individual had a

protected property interest in the value of their property beyond the tax debt in a different context

from *Fair* is also instructive.   *See Hall v. Meisner*, 51 F.4th 185 (6th Cir. 2022), *cert. denied*, 143

S. Ct. 2639.   In *Hall*, a county in Michigan foreclosed on the home of Tawanda Hall to collect a

tax delinquency (tax, interest, and penalties) of $22,642.   51 F.4th at 189.   The county then

conveyed the property to a city for the same amount.   *Id.*   The city then conveyed the property

for $1 to a for-profit entity, which later sold it for $308,000.   *Id.*   Although the decision was

rendered pre-*Tyler*, the court in *Hall* applied a similar analysis to the issue before it.   *Id.* at 189-

190.   The court conducted a detailed historical analysis of traditional property interests from

English common law through the 1800s, finding that property interests exist in value exceeding

debts.   *Id.* at 190-94.   The court also found that Michigan law recognizes equitable title in

contexts other than the one in front of it.   *Id.* at 194-95.   Based on this analysis, the court held

that the plaintiffs had a protected property interest in the value of their property beyond the tax

debt.   *Id.*

---

[3] The Nebraska Supreme Court stated that Nebraska law "recognized a property owner's right to equitable title in other contexts," providing one example that "outside of the tax deed process, delinquent real property taxes may be pursued through a judicial foreclosure, but there, the property is sold and surplus proceeds are returned to the original owner."   *Fair II*, 317 Neb. 391, 405.

These cases, which examine traditional property principles, support a finding that Plaintiffs have a protected property interest in the equity of their property in excess of their tax debt.  Rather than conducting its own independent historical analysis, this Court leans on the analysis conducted by the Supreme Court in *Tyler* and the Sixth Circuit in *Hall* in finding that traditional property principles establish a protected interest in Plaintiffs' equity in excess of their tax debt.

   ii.   West Virginia Law

West Virginia law also indicates that Plaintiffs have a protected property interest here because, while former homeowners are allowed to collect the excess proceeds from sales in other contexts, it is not allowed in this case.  In *Tyler*, the Supreme Court found that a property interest existed by reasoning, in part, that "Minnesota law itself recognizes that in other contexts a property owner is entitled to the surplus in excess of her debt," and it cannot "extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking."  598 U.S. at 645.  The same principle applies here.

Like the state law in *Tyler*, West Virginia law recognizes a former owner's right to surpluses in other contexts.  *See, e.g.,* W. Va. Code § 11A-3-65 (permitting former property owners to file a claim for the surplus of a sale when the property was sold pursuant to W. Va. Code §§ 11A-3-45 and 48).  Thus, like the state in *Tyler*, West Virginia cannot ignore that property interest in a different context in order to avoid paying just compensation when it is the one doing the taking.

The Court notes that, citing West Virginia Code § 11A-3-65, the parties claim that "state law allowed Plaintiffs an avenue to claim the premium paid by TASHPA for the tax lien."  (ECF No. 29 at 9-10; ECF No. 35 at 9.)  However, Section 11A-3-65 is not applicable to the process

used in this case because it only applies to "[t]he former owner of any delinquent or nonentered lands sold *pursuant to sections forty-five and forty-eigh*t of [Article Three]."   W. Va. Code § 11A-3-65 (emphasis added).

Rather, the tax lien certificate was sold pursuant to West Virginia Code §§ 11A-3-5(a) (2000) and 11A-3-14 (1998)[4].   Here, the applicable surplus statute is § 11A-3-10 (1995), which does not actually give the former owner a right to the surplus proceeds, but rather directs the sheriff to place the surplus in a "special county fund" designated as the "sale of tax lien surplus fund." W. Va. Code § 11A-3-10 (1995), *repealed by* Acts 2022, C. 271, eff. June 10, 2022.   Under this statute, the surplus is later distributed to the purchaser of the tax lien or distributed by the sheriff "in the manner provided by law for the distribution of property taxes collected by him."   *Id.* Therefore, Plaintiffs never had an opportunity to collect the difference between the tax lien sale price and the taxes owed in this instance.

Accordingly, because West Virginia law recognizes property interests in debt surpluses in other contexts, and because traditional property interests and history (as analyzed in *Tyler* and *Hall*) recognize that "a government may not take more from a taxpayer than she owes," this Court finds that Plaintiffs have a protected interest in the equity of their home in excess of the debt owed. *Tyler*, 598 U.S. at 639.

---

[4] In fact, the Certificate of Sale itself lists the authorities under which the tax lien was sold, describing § 11A-3-14 (1998) as the authority for the sale.   (ECF No. 28-4.)   The Certificate also lists the applicable surplus statute as § 11A-3-10.   (*Id.*)

### 2. *Defendant's Alleged Taking*

Now that the Court has recognized that Plaintiffs have a protected interest in their property equity in excess of the tax debt owed, it must determine whether Defendant engaged in an uncompensated taking by transferring the tax deed to TASHPA.

"A taking can be of personal or real property, and it can be effected through either a physical appropriation of the property by the Government or through a regulation that goes too far in depriving the owner of her property rights." *Maryland Shall Issue, Inc., v. Hogan*, 963 F.3d 356, 364 (4th Cir. 2020) (internal quotations omitted). "[T]he act of taking is the event which gives rise to the claim for compensation." *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180, 190 (2019) (citing *United States v. Dow*, 357 U.S. 17, 22 (1958.). Under West Virginia law, when a tax lien is sold to a third party, "[t]itle to the property remains with the tax-delinquent owner until the purchaser completes the tax lien process and secures the deed." *Folse v. Rollyson*, 895 S.E. 2d 244, 250 (W. Va. Ct. App. 2023). While the tax lien creates an encumbrance and diminishes the owner's property rights, the lien purchaser does not obtain title until execution and delivery of the tax deed. *Id.*; *WVTB, LLC v. Weeks*, 2024 WL 5199155 at *3 (W. Va. Ct. App. 2024).

Defendant argues that it did not engage in an uncompensated taking because Defendant "sold its tax lien and the rights to enforce the same—it did not take the excess value of the . . . property." (ECF No. 31 at 7.) Defendant also argues that it did not engage in a taking because it never took absolute title to the property and was only performing a ministerial duty that it was "statutorily required to do." (ECF No. 35 at 6-7.) Plaintiffs counter that the taking occurred when Defendant issued the tax deed to TASHPA, so it is irrelevant who received the windfall or

11

absolute title.  (ECF No. 33 at 5-8.)  Plaintiffs also argue that, even if TASHPA took Plaintiffs'
property, this fact would not be determinative because the two are joint actors who are jointly and
severally liable for any injuries inflicted.  (ECF No. 34 at 7-8.)  However, as discussed below,
there are no genuine disputes of material fact that (1) a taking occurred (2) without just
compensation.

      i.  <u>The Taking</u>

Clearly, a taking occurred here.  Plaintiffs had $105,400.00 in equity in their property
before the tax deed transfer.  After that, Plaintiffs had no equity in their property.

Defendant's argument that it was only performing a ministerial duty under state statute is
unpersuasive and unsupported by law.  First, as Plaintiffs correctly assert, Defendant was not
required to utilize the process in this case to collect the delinquent property taxes.[5]  (ECF No. 33
at 2-3.)  For example, Defendant, through its Sheriff, could have prosecuted a civil action against
Plaintiffs seeking a personal liability judgment.  W. Va. Code § 11A-2-2.  Defendant could have
also had the Sheriff "distrain any goods or chattels in the county belonging to the person or to the
estate in land assessed with the taxes."  W. Va. Code § 11A-2-3.  Furthermore, even if state law
required Defendant to utilize the process in question, "[a] permanent physical occupation
authorized by state law is a taking without regard to whether the State, or instead a party authorized
by the State, is the occupant."  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419,
432 n.9 (1982) (holding that a law requiring landlords to permit cable television companies to
install equipment on their properties violated the Takings Clause); *see Maryland Shall Issue, Inc.*,

---

[5] "*In addition* to the methods for the collection of taxes provided for in this article, tax liens on real estate *may* be sold
for the taxes assessed thereon in the manner prescribed in article three of this chapter."  W. Va. Code § 11A-2-10
(emphasis added).

963 F.3d at 365 (stating that "when a regulation authorizes a third party to physically take property, that regulation effects a per se regulatory taking."). The state law and Defendant's act here did more than just allow a minor occupation of the property like installing a cable box – it effectuated the taking of Plaintiffs' protected property interest in the surplus equity of their property.

Further, Defendant provides no caselaw in support of its argument that they are not liable for the taking because they did not receive the excess value or absolute title. To the contrary, as the Supreme Court has established, it is the "act of the taking" which gives rise to the claim for compensation, not who ultimately receives the windfall or the property. *Knick*, 588 U.S. at 190; *see Hall*, 51 F.4th at 196 (holding that before the county took title, "the plaintiffs held equitable title; after it, they held no title at all. Thus . . . the County alone is responsible for the taking of the plaintiffs' property."); *see Sharritt v. Henry*, 2024 WL 4524501 at *11 (N.D. Ill., 2024) (holding that takings are not limited to "situations where the government also *retains* the property."). Here, Plaintiffs retained their equity and title to the property until the tax deed was signed and issued to TASHPA by Defendant on April 29, 2022. This was the "act of the taking" that deprived Plaintiffs of their protected property interest in their equity. Despite not receiving the title or excess equity, Defendant effectuated the transfer of the tax deed to TASHPA and are therefore responsible for the taking.

ii. Without Just Compensation

Lastly, it is undisputed that the taking here was uncompensated. Not only did Plaintiffs not receive the equity in their property in excess of the debt owed, but Defendant's sale of the tax lien satisfied the delinquent property taxes and Defendant retained the surplus of that sale. (ECF No. 39 at 9; ECF No. 30-1.)

13

Accordingly, Plaintiffs are entitled to judgment as a matter of law on Count I because: (1) Plaintiffs had a protected property interest in the equity of their property in excess of the debt owed; (2) Defendant's act in transferring the tax deed to TASHPA was a taking; and (3) the taking was uncompensated.

### B.  Count II

In Count II, Plaintiffs allege that Defendant's transfer of the tax deed to TASHPA violated the Excessive Fines Clause of the Eighth Amendment because it was not purely remedial and bore no correlation to the actual loss of tax revenue.   (ECF No. 1 at 9-10.)

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  This Amendment protects "against excessive fines [and] guards against abuses of [the] government's punitive or criminal law enforcement authority."  *Timbs v. Indiana*, 586 U.S. 146, 149 (2019). The Excessive Fines Clause "limits the Government's power to extract payments, whether in cash or in kind, as punishment for some offense."  *United States v. Bajakajian*, 524 U.S. 321, 328 (1998).  The Clause is applicable to criminal and civil sanctions.  *Austin v. United States*, 509 U.S. 602, 610 (1993).   The Clause is also not limited to pure monetary fines.   *See id.* at 621-22. If a civil sanction only serves a remedial purpose, it is not subject to the Eighth Amendment. *Korangy v. United States F.D.A.*, 498 F.3d 272, 277 (4th Cir. 2007).   However, "if a civil sanction can only be explained as serving in part to punish," it is subject to the Eighth Amendment.   *Id.* (quoting *Austin*, 509 U.S. at 610.)   If a civil sanction is at least partly punitive, it will be found constitutionally excessive only if it is "grossly disproportional to the gravity of [the] offense."   *Id.* at 277 (quoting *Bajakajian*, 524 U.S. at 334).

14

In analyzing whether an Excessive Fines Clause violation occurred, the Court must first determine whether the sanction was purely remedial, and if not, then the Court must determine whether the sanction was grossly disproportional to the gravity of the offense. *Korangy*, 498 F.3d at 277. If a sanction is not purely remedial *and* is grossly disproportional to the gravity of the offense, an excessive fine has occurred in violation of the Eighth Amendment.

Defendant argues that Count II fails as a matter of law because the purpose of the tax lien sale was purely remedial and because Defendant never obtained title to the property or the excess equity. (ECF Nos. 31 at 10; 32 at 9.) Plaintiffs argue that the carrot-and-stick nature of the tax lien system makes the procedures used in this case "not wholly remedial." (ECF Nos. 29 at 13; 33 at 12-13.) Plaintiffs also argue that it is irrelevant whether Defendant obtained title to the property or the excess equity because "[t]he object of the Excessive Fines clause is to limit the extent to which the government may financially punish a private party." (ECF No. 34 at 11.) Finally, Plaintiffs argue that Defendant's argument regarding the tax lien sale is misplaced because Plaintiffs are asserting that the April 29, 2022, transfer of the tax deed to TASHPA—*not* the initial tax lien sale—was an excessive fine. (ECF No. 33 at 10.)

As discussed below, there is no genuine dispute of material fact that (1) the West Virginia tax lien system is not purely remedial, and (2) Defendant levied a grossly disproportional sanction against Plaintiffs.

1. *Remedial Nature of the Sanction*

The tax lien process used here occurred pursuant to West Virginia Code § 11A-3, *et seq.* ("Article Three"). (ECF No. 28-4.) Article Three was implemented by the West Virginia Legislature with a view that "delinquent land not only constitutes a public liability, but also

represents a failure on the part of delinquent private owners to bear a fair share of the costs of government." W. Va. Code § 11A-3-1. One of the listed purposes of Article Three is "to provide for the transfer of delinquent and non-entered lands to those that will make beneficial use of said lands who are more responsible to, or better able to bear, the duties of citizenship than were the former owners." *Id.* Furthermore, West Virginia courts have referred to the state's tax lien system in the following manner:

> West Virginia's tax lien system serves as a carrot-and-stick to encourage the important public policy of speedy and efficient payment and collection of property taxes. W. Va. Code Ann. § 11A-3-1. The stick in this statutory scheme is aimed at tax-delinquent property owners, and the carrot is the opportunity for a purchaser to acquire property cheaply by purchasing the tax lien and paying the taxes.

*Folse*, 895 S.E. 2d at 248, 251 (holding that "a tax-delinquent property owner, after the end of the protected redemption period . . . only has the right to redeem their property, not to convey"). This is a "carrot-and-stick system to ensure that property taxes are paid. To allow a tax-delinquent property owner to convey their property after the tax lien purchaser's right to the deed had accrued would sour the carrot and shorten the stick." *Id.* at 251.

In this case, when the tax lien was initially auctioned to TASHPA for $4,750.00, the total amount Plaintiffs owed was $701.28. (ECF No. 30-1.) When the tax deed was transferred to TASHPA, Plaintiffs owed $2,238.18. (ECF No. 28-5.) For 2022, the Wood County Assessor evaluated the fair market value of the property at $105,400.00. (ECF No. 28-1.) The difference between the property's assessed value and what Plaintiffs owed at the time is $103,161.82.

Defendant focused a large portion of its argument on the assertion that Count II fails as a matter of law because the purpose of the tax lien sale was purely remedial. (*See* ECF Nos. 31 at 10-12; 32 at 9-10; 35 at 7-9.) However, to reiterate, Plaintiffs are not alleging that the initial tax

lien sale was the excessive fine, but rather *the transfer of the tax deed* to TASHPA was the excessive fine.  (*See* ECF Nos. 1 at 9-10; 34 at 9.)  For example, Plaintiffs argue that "Wood County sanctioned Plaintiffs by taking the entirety of the $105,400.00 value of the Property and giving it to TASHPA LLC, which held only a $2,238.82 tax lien."  (ECF No. 29 at 14.)  The entire allegation relates to the transfer of the deed, not the initial tax lien sale.  To the extent that Defendant advances arguments about the initial tax lien sale itself, such arguments are irrelevant and nonresponsive.

Defendant's only responsive argument is that the tax lien scheme is remedial because Defendant never obtained the excess equity or title in the property.  (*See* ECF Nos. 31 at 12-13; 32 at 10-11; 35 at 7-10.)  Defendant argues that its "only action aimed at recouping delinquent tax payments was selling [the] tax lien at public auction," which never resulted in Defendant acquiring the excess equity or title to the property.  (ECF No. 35 at 9.)  Still, Defendant provides no caselaw to support this argument.  Instead, as previously mentioned, the Excessive Fines Clause protects "against excessive fines [and] guards against abuses of [the] government's punitive or criminal law enforcement authority." *Timbs*, 586 U.S. at 149.  The Excessive Fines Clause also "limits the Government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Bajakajian*, 524 U.S. at 328.  Thus, the purpose of the Clause is to limit the government's ability to excessively punish a private party through financial means.  Therefore, it is irrelevant that Defendant did not receive the property title or equity, and the sanction used here must be examined as to its remedial nature and proportionality.

If a civil fine only serves a remedial purpose, it is not subject to the Eighth Amendment. *Korangy*, 498 F.3d at 277.  As outlined above, the West Virginia Legislature enacted the tax lien

17

system in part to transfer delinquent property to others who will use it in a more beneficial manner. W. Va. Code § 11A-3-1. The tax lien system has also been described as a "carrot-and-stick" system with the "stick . . . aimed at tax-delinquent property owners." *Folse*, 895 S.E. 2d at 248. Based on the intent and purpose of the tax lien system, combined with its carrot-and-stick nature as outlined in *Folse*, it is clear that the system is at least partially punitive.[6]

Undoubtedly, the tax lien system is not purely remedial because it allows counties to collect more money than they are owed during a tax lien sale, which satisfies the debt, but the property still may be transferred to a third-party despite that debt satisfaction.[7] The transfer of the property serves as a punishment to the former owner for their delinquency. A process would be purely remedial if Defendant sold the property at an auction, retained only the amount required to satisfy the delinquent taxes and related costs, then returned the excess funds to the former owner. That did not occur here. Therefore, because the tax lien system was at least partially punitive, the Court next determines whether the fine was excessive.

### 2. Disproportionality Analysis

A civil sanction is constitutionally excessive only if it is "grossly disproportional to the gravity of [the] offense." *Bajakajian*, 524 U.S. at 334. In examining this, courts can weigh four factors: (1) the "nature and extent of illegal activity;" (2) "whether the defendant fit into the class of persons for whom the statute was principally designed;" (3) "the maximum penalties that a court could have imposed for the offense;" and (4) "the harm caused by the offense." *United States v.*

---

[6] The carrot and stick metaphor refers to a process when two methods of incentivization are simultaneously employed. The carrot is a positive method of incentivization while the stick serves as a method of punishment.

[7] "[A] statutory scheme may still be punitive where it serves another goal of punishment, such as deterrence. . . . Economic penalties imposed to deter willful noncompliance with the law are fines by any other name. And the Constitution has something to say about them: They cannot be excessive." *Tyler*, 598 U.S. at 649-50 (Gorsuch, J., concurring) (internal quotations omitted).

*$134,750 U.S. Currency*, 535 F. App'x 232, 239 (4th Cir. 2013) (citing *Bajakajian*, 524 U.S. 321); *see Sharritt*, 2024 WL 4524501 at \*15 (applying the *Bajakajian* factors to the transfer of Illinois tax deeds.)

Defendant argues that even if the tax lien sale was partially punitive, the sale for $4,750.00 was not grossly disproportionate to the tax delinquency because it only resulted in a surplus of $3,467.79. (ECF No. 31 at 12.) However, as outlined above, Plaintiffs do not assert that the tax lien sale was an excessive fine, but rather the tax deed transfer itself. Regardless, Defendant repeats its argument that "[t]o the extent Plaintiffs argue the 'excessive fine' was depriving them of the equity of their entire home, Plaintiffs are incorrect. The Commission never took absolute title to the West Virginia Avenue property and never acquired the excess value between the tax debt and the home's equity to satisfy Plaintiff's tax delinquency." *Id.* at 12. Plaintiffs argue that the transfer of $105,400.00 in equity to satisfy a $2,238.82 tax debt was grossly disproportionate because it "bore no correlation to Plaintiffs' actual wrongdoing or the amount of anyone's actual loss." (ECF No. 34 at 12.) Plaintiffs also argue that the tax lien system does not require or provide any mechanism to adjust the sanction to ensure it is not grossly disproportionate to the amount owed or the reasons for a homeowner's failure. (*Id.* at 12-13.) Again, as Defendant's arguments relate to the tax lien sale and not the transfer of the tax deed, they are irrelevant and nonresponsive to Plaintiffs' position. Further, as the Court already established, Defendant provides no support for the argument that because it never received the excess equity or title to the property, it is not liable.

As to the *Bajakajian* proportionality analysis, courts first examine the nature and extent of the illegal activity. Here, Plaintiffs failed to pay their property taxes due to financial difficulties

resulting from the COVID-19 pandemic. (ECF No. 29 at 14.) When Plaintiffs did gather the money, Plaintiff Reutelshofer attempted to pay the redemption amount, but mistakenly applied the money to another property. (ECF No. 29 at 3.) Regardless of Ms. Reutelshofer's mistake, Plaintiffs certainly violated the law by not paying their property taxes on time. However, based on the facts surrounding this mild, non-criminal violation, the nature of the illegal activity does not warrant a large fine.

The second factor looks at whether the defendant fits into the class of persons for whom the statute was principally designed. This is easily satisfied as Plaintiffs were property owners and the statutory scheme required property owners to pay their taxes on time.

The third factor examines the maximum penalties that a court could have imposed for the offense. Under a purely remedial system, the maximum penalties would be limited to the amount the defendant owes in taxes and related costs. However, under the system in this case, the maximum penalty is undefined because it hinges on the fair market value of the transferred property. In this case, that maximum penalty was $103,161.82, which was the difference between the property's assessed value and what Plaintiffs owed at the time.[8] Despite the lack of a statutory maximum penalty, common sense dictates that applying a penalty worth approximately 46 times Defendants' loss certainly weighs in favor of holding that the fine was excessive.

Finally, the fourth factor examines the harm caused by the offense. While Plaintiffs' unpaid taxes likely caused some harm and deprived the county of $2,238.82 in taxes and costs, taking $103,161.82 in equity is grossly disproportional to the harm caused. In weighing all four

---

[8] The Court notes that assessors' valuations of property are often below the actual fair market value.

factors, the sanction here is clearly grossly disproportional to the gravity of the offense, as a matter of law and undisputed fact.

Therefore, because the statutory scheme here was not purely remedial and because the fine was grossly disproportional to the gravity of the offense, Defendant levied an excessive fine against Plaintiffs in violation of the Eighth Amendment.   Plaintiffs are entitled to Judgment as a matter of law on Count II.

## IV.    CONCLUSION

For the above-mentioned reasons, Plaintiffs' Motion for Summary Judgment, (ECF No. 28), is **GRANTED** and Defendant's Motion for Summary Judgment, (ECF No. 30), is **DENIED**. Counsel for Plaintiffs is **DIRECTED** to file with the Court within 30 days of entry of this Memorandum Opinion and Order an affidavit setting forth in detail the exact amount owed by Defendant, at which time a separate Judgment Order will be entered implementing the rulings contained herein.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        April 29, 2025

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE